# EXHIBIT 2

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

January 22 2020 3:13 PM

KEVIN STOCK
COUNTY CLERK
**NO: 20-2-04422-4**

1

2

3

4

5

6

7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF PIERCE

8

9

| MAXINE McCALLUM, | **Cause No.:** |
|---|---|
| Plaintiff, | COMPLAINT FOR DAMAGES |
| v. | |
| H. YORK ENTERPRISES, LLC, a Washington Limited Liability Company, | |
| Defendant. | |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Plaintiff Maxine McCallum ("McCallum"), by and through her undersigned attorneys, hereby asserts the following Complaint against Defendant H. York Enterprises, LLC ("York"). McCallum brings this action for breach of contract for York's material breach (including abandonment) of its contract that occurred on or about July 22, 2019, related to home renovation services that York was contractually-obligated to perform, and for property damage that occurred on or about May 29, 2019, caused by York's negligence at her home located at 521 North Yakima Avenue, Tacoma, Washington 98403 in Pierce County, commonly known as the Second Rust Mansion.  In support of her Complaint and upon information and belief, McCallum alleges the following:

COMPLAINT FOR DAMAGES  - 1

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

## I.   PARTIES

1.   At all relevant times, Maxine McCallum was a Washington resident.  She is a co-owner of and resides at 521 North Yakima Avenue, Tacoma, Washington 98403.

2.   York is a Washington corporation authorized to do business in Washington, with its principle place of business and registered agent located at 3517 South 13th Street, Tacoma, Washington 98405.   At all material times, York acted as the contractor for the Residence.

3.   For purposes of this Complaint, York refers to York and/or its employees, representatives, agents, or others working under its direction, control, or supervision.

## II.   JURISDICTION AND VENUE

4.   McCallum realleges all preceding paragraphs as though fully set forth herein.

5.   This Court has jurisdiction and venue over the Parties and subject matter of this Complaint.  The subject matter that forms the basis of this lawsuit is breach of contract and damage to property located at the Residence.

6.   Pursuant to RCW 2.08.010 jurisdiction is proper in this Court.

7.   Pursuant to RCW 4.12.020 venue is proper in this Court because the subject matter of this action occurred in Pierce County.

8.   York owns, operates, and transacts business through its office located at 3517 South 13th Street, Tacoma, Washington 98405. At all material times hereto, York entered into contractual relationships, was transacting business, and engaged in construction activities in Washington.

9.   All actions hereinafter alleged to have been performed by York were done for and on York's behalf.

COMPLAINT FOR DAMAGES  - 2

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

### III.   MANDATORY ARBITRATION

10.   This matter is subject to Mandatory Arbitration through the Superior Court of Pierce County pursuant to the agreed-upon arbitration provision in the Parties' Remodeling Contract, entered into on January 29, 2019.

11.   The Parties agreed that any dispute "between the parties shall be decided according to the Mandatory Arbitration Rules of the County in which the suit is filed, regardless of the amount in dispute."

12.   McCallum plans to file a Motion to Transfer to Mandatory Arbitration shortly after filing of this complaint to set the case pursuant to the Mandatory Arbitration Rules. McCallum objects in advance to any discovery propounded by York to McCallum that is not within the purpose and spirit of the Mandatory Arbitration Rules.

### IV.   FACTS

**Historic Home Remodel.**

13.   McCallum realleges all preceding paragraphs as though fully set forth herein.

14.   The McCallum home is a historically-relevant 1913 two-story brick home (with a basement) designed and built for William Rust, one of Tacoma's early prominent businessmen and benefactors and the namesake of the City of Ruston (the "Residence"). The Residence, generally known in the Tacoma community as the Second Rust Mansion, was designed by prominent early-20th century Tacoma architect Fredrick Heath (known for, among other things, the design of Stadium High School, Lincoln High School, and the Pythian Temple) and includes a movie theatre, a detached carriage house with an in-law suite, and a 1,000+ square-foot

COMPLAINT FOR DAMAGES  - 3

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

1   basement ballroom in nearly original condition (including the original tin ceiling, original silk

2   wall coverings, elevated bandstand, and knob-and-tube electrical wiring).

3   15.   Although it was in generally fair condition when McCallum purchased the

4   Residence in 2018, certain renovations were required to the main and second floors to restore

5   the Residence's appeal, update certain aspects of the Residence to modern standards, and meet

6   the McCallum family's needs for its primary residence.

7

8   16.   Because the Residence was over 100-years old and historically-relevant, and

9   cognizant that these characteristics may require special construction know-how, McCallum

10  sought a renovation contractor known in the community and capable of renovating a historic

11  home with the attendant care and quality befitting a community-important home.  McCallum's

12  search led her to York, which represented it was capable of completing the work with the skill,

13  care, and quality sought by McCallum.

14

15  17.   York encouraged McCallum to enter into a time and materials contract first,

16  claiming it would only be for the demolition portion of the work. This would allow York to get

17  a better understanding of the existing conditions within the Residence before eventually

18  converting the project into a lump sum contract once the full scope of the renovation project was

19  fully understood.  The goal was to avoid large dollar change orders and/or delays in the

20  completion of the work during Project performance.

21

22  18.   On approximately September 12, 2018, McCallum and York entered into a Time

23  and Materials contract for renovation work (the "T&M Contract"), a true and correct copy of

24  which is attached to this Complaint as Exhibit A and incorporated by reference.

25

26

COMPLAINT FOR DAMAGES  - 4

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

1    19.    On or about October 2, 2018, York commenced work on the Residence on a Time

2  and Materials basis.

3    20.    McCallum repeatedly asked for York to convert to the lump sum contract once

4  conditions were fully understood, but York delayed changing from the T&M Contract.

5
6    21.    By January 2019, York finally agreed to convert its work to lump sum and

7  proposed a lump sum contract.

8    22.    On or about January 29, 2019, McCallum and York entered into a subsequent

9  Remodeling Contract where York agreed to complete specified renovations for the lump sum of

10  $1,052,631.35 (inclusive of Washington State Sales Tax) and with the promise of a 5% discount

11  for timely payments that were not made via credit card. A true and correct copy of the

12  Remodeling Contract is attached to this Complaint as Exhibit B and incorporated by reference.

13
14    23.    The Remodeling Contract's scope of work was limited to work on the

15  Residence's exterior; main, second, and third floors; the carriage house; and next to the ballroom

16  in the theater (rewiring and bathroom).  It did not include any work in the historic basement

17  ballroom.

18    24.    Despite McCallum's request, York encouraged McCallum to keep the T&M

19  Contract in place (rather than close it out entirely) so that any additions to the Remodeling

20  Contract's scope could be billed under the T&M Contract, rather than through the changes

21  provision of the Remodeling Contract.

22
23    25.    Based on York's encouragement, McCallum agreed to leave the T&M Contract

24  in place to address any changes to York's work on the Project.

25

26

COMPLAINT FOR DAMAGES  - 5

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

**The McCallums Move Into the Carriage House**

26.     During contract negotiations, York represented that it would be complete with enough work in the front half of the Residence by late December 2018 that the McCallum family could move in while York finished the balance of the work. The McCallums relied upon York's representations and sold their other home with the understanding that they would be able to move into the Residence.  Unfortunately, York did not complete its work as promised.

27.     By April 2019, the main Residence still was not ready for the McCallums to move in.  Left with no other place to live, York encouraged the McCallums to move into the carriage house (which they did) while work on the main Residence was finished.

28.     York and the McCallums agreed that the main Residence would be complete by May 17, 2019 and that the McCallums would move-in on May 24, 2019.

29.     On the move in date, the Project remained incomplete.

30.     McCallum sent Tyler York and Steve Leonard (project supervisor for York), communications regarding the deficiencies that needed to be addressed in the carriage house. They agreed the deficiencies needed to be completed or fixed.

31.     About a week before the scheduled completion date of May 17, 2019, Steve Leonard informed McCallum that York would not be able to meet the completion deadline and that York needed only an extra week to complete the entire Project.  McCallum agreed to reschedule her movers based on these representations.

32.     McCallum eventually moved in on approximately June 11, 2019.  At that time, York promised they would be done with the home shortly thereafter.

COMPLAINT FOR DAMAGES  - 6

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

Exhibit 2

33.     Pursuant to the terms of the Remodeling Contract, York had control of the Project site, including the Residence.

34.     Additionally, pursuant to Remodeling Contract Section 10, York assumed the duty to "exercise reasonable care to protect [McCallum's] property and possessions from harm."

**York Failed to Secure the Residence Leading to Catastrophic Flooding Event.**

35.     By late May 2019, York was still working on the main Residence and the McCallums were still living in the partially-completed carriage house.

36.     On May 29, 2019, the City of Tacoma turned off water in the area of the Residence in order to conduct repairs.

37.     York was aware and had notice that the water was shut off that day.

38.     Indeed, Steve Leonard, a project supervisor for York, informed McCallum by text message that morning that the City had shut off water.

39.     Aware that the City shut off water in the Residence's neighborhood, York took various actions so it could continue work on the Residence despite the water outage.   This included, but was not limited to, York renting temporary outhouses for its laborers and subcontractors.

40.     Among its other work that day, York's crews worked in the Master Bathroom on the Residence's second floor, either painting the bathroom or preparing the bathroom for paint.

41.     This work included, but was not limited to, covering bathroom fixtures – including the bathtub – with a water-resistant or waterproof drop cloth to protect the fixtures from paint.

COMPLAINT FOR DAMAGES  - 7

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

42.     Despite its awareness of the water shut off, York failed to properly secure the Residence before leaving the night of May 29, 2019.

43.     In particular, York failed to ensure that all water fixtures or the main water supply line were in the "off" position.

44.     Indeed, a fixture controlling the flow of water to the bathtub faucet in the Master Bathroom was left in the "on" position.

45.     Upon information and belief, at approximately 7:00pm that night (and after York left the Residence for the day) the City of Tacoma restored water service for the Residence's neighborhood.

46.     Because the bathtub faucet in the Master Bathroom and main water supply line were negligently left in the "on" position, water began pouring out of the bathtub faucet once water service was restored.

47.     However, because the bathtub was covered with a water-resistant or water-proof drop cloth, the water pouring out of the faucet could not reach the bathtub and its drain.

48.     As a result, the Residence sustained catastrophic and substantial water damage as water poured from the bathtub faucet onto the Master Bathroom floor, spread throughout the second floor, cascaded down the stairs, and wept through the ceilings to the first floor and historic basement ballroom.

49.     The water damage was extensive and required substantial remediation.  First, the entire Residence needed to be dried out.  Second, work performed by York – including, but not limited to, refinished wood floors, trim, drywall and plaster wall work – had to be remediated or replaced entirely.

COMPLAINT FOR DAMAGES  - 8

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340 1000

Exhibit 2

50.     Moreover, the Residence's original historic ballroom was irretrievably damaged; the water warped and/or otherwise ruined the original tin ceiling panels, the original silk wall coverings, the original wood wainscoting and wood floors, and the original knob-and-tube electrical wiring.  The original wallpaper cannot be replaced as it is no longer in existence for purchase.  The original woodwork needs to be sanded down and matched to the 100 year patina that is on the undamaged woodwork.

51.     Not only will it be difficult, if not impossible, to repair the original tin ceiling, the water damage has rendered the basement's original knob-and-tube, electrical system unusable.

52.     On May 29, 2019, the day of the flooding event, York's representative, Andrew Phillips, admitted in person that York was at fault.  On May 30, 2019, he admitted the same to McCallum via text.

53.     Mr. Phillips explicitly took responsibility for York's failure to ensure that all plumbing fixtures or the main water supply line were in the "off" position prior to leaving the Residence on May 29, 2019.

54.     Upon information and belief, York terminated Mr. Phillips after the flooding event for his failure to exercise reasonable care and prevent flooding at the Residence.

55.     Following the flooding event, York took steps to remediate water damage to the work it installed or performed on the Residence's main and second floors.

56.     York, however, has steadfastly refused to perform all necessary remedial work that is a direct and proximate result of the flooding caused by its failure to exercise reasonable care.

COMPLAINT FOR DAMAGES  - 9

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

57.     As a result, McCallum sought and obtained an estimate to repair the historic basement ballroom.  Because of the unique and historic materials which must be replaced and because the entire basement must now be rewired to replace the knob-and-tube electrical system, the estimate to repair the basement ballroom exceeded $400,000.

**York Abandons its Work and Materially Breaches the Remodeling Contract.**

58.     On July 22, 2019, without remedying all of the water damage and admitting that it was not complete with its contract Work, York materially breached the Remodeling Contract by abandoning the Project.

59.     Indeed, that day, York's production manager, Jeff Sharpe, told McCallum that York was "pull[ing] out of the jobsite" even though there remained incomplete work.

60.     Mr. Sharpe acknowledged that Ms. McCallum would be entitled to an adjustment of the contract price for the work York left incomplete.

**York Failed to Complete its Remodeling Work Prior to Abandoning the Project.**

61.     York's failure to remedy all of the water damage was not the only item it failed to complete.  York failed to fully perform significant portions of its contract scope of work before walking off the Project in late July.

62.     On or about August 8, 2019, following York's abandonment of the Project and its remaining work, McCallum retained Construction Dispute Resolution, Inc. ("CDR") to conduct a site visit and review the status of York's work and identify any outstanding or deficient work items left by York as of its abandonment of the Project.

63.     In its October 7, 2019 report, CDR stated that "York Enterprises has not completed its Contract work."

COMPLAINT FOR DAMAGES  - 10

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

64.   Additionally, CDR noted an "extensive number" of "incomplete or unacceptable" deficiencies.  These deficiencies have not been addressed to date.

65.   McCallum estimates that the cost to complete and correct York's scope of work will cost her significant amounts in excess of any amounts remaining under the Remodeling Contract.

**York and its Subcontractor, ServPro, Filed Mechanic's Liens Against the Residence.**

66.   Following its abandonment and material breach of the Project, York filed multiple mechanic's liens against the Residence, including:

> (a) Instrument No. 201908140147, dated August 14, 2019, in the amount of $17,200.31;
>
> (b) Instrument No. 201909270574, dated September 27, 2019, in the amount of $111,691.74; and
>
> (c) Instrument No. 201910100255, dated October 10, 2019, in the amount of $50,035.77.

67.   Additionally, on or about October 1, 2019, ServPro filed a mechanic's lien against the Property in the Pierce County land records, Instrument No. 201910070778, in the amount of $104,034.10.  ServPro was the subcontractor hired by York to dry out the Residence following the May 29, 2019 flooding event.

68.   Because McCallum's damages as a result of York's material breach of contract and negligence exceeds any unpaid amounts under the Remodeling or T&M Contracts, neither York nor ServPro are entitled to a mechanic's lien against the Residence.

69.   McCallum has satisfied all conditions precedent to maintaining this action.

COMPLAINT FOR DAMAGES - 11

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

## V.   FIRST CAUSE OF ACTION:  BREACH OF CONTRACT -- ABANDONMENT

70.   McCallum realleges all preceding paragraphs as though fully set forth herein.

71.   The Parties entered into a valid and enforceable contract.

72.   Defendant York materially breached that contract by abandoning its performance under the contract prior to completing its scope of work.

73.   As a direct and proximate result of York's material breach of contract, McCallum has or will incur damages in an amount no less than $450,000, the exact amount to be proven at trial in this matter.

## VI.   SECOND CAUSE OF ACTION: BREACH OF CONTRACT- BREACH OF STANDARD OF CARE

74.   McCallum realleges all preceding paragraphs as though fully set forth herein.

75.   The Parties entered into a valid and enforceable contract.

76.   Pursuant to the terms of the contract, York agreed to "exercise reasonable care to protect property and possessions from harm."

77.   York materially breached the contract by failing to exercise reasonable care in performance of its contract work.  In particular, York failed to exercise reasonable care by failing to either shut off the Residence's main water supply line or ensuring that all water fixtures in the Residence were in the "off" position when it finished work and left the Residence on May 29, 2019 despite knowing that the City of Tacoma had temporarily shut off water supply to the Residence that morning and not knowing the duration of the City's temporary water shut off.

78.   As a direct and proximate result of York's failure to exercise reasonable care, McCallum sustained significant property damage and has or will incur significant damages to

COMPLAINT FOR DAMAGES  - 12

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

repair water damage that occurred after the water was turned back on in an amount no less than $400,000, the exact amount to be proven at trial.

## VII.   THIRD CAUSE OF ACTION: NEGLIGENCE

79.     McCallum realleges all preceding paragraphs as though fully set forth herein.

80.     York, as a professional contractor, owed a duty of reasonable care while performing its remodeling and construction work on the Residence. This included, without limitation, securing all water faucets before leaving the Residence in light of the water outage, ensuring proper drainage on the site for open water valves, and adequate monitoring of potential damage-causing mechanisms to the Residence. York also had a duty of reasonable care to timely detect and prevent further water damage.

81.     York owed a duty to McCallum and failed to perform its work in a safe, professional, and workmanlike manner, and prevent water damage to the Residence.

82.     York breached its duty of reasonable care by failing to secure and shut off all faucets and other plumbing fixtures before leaving the premises in light of the City of Tacoma's temporary water shut-off.

83.     As a direct and proximate result of York's negligence, the Residence sustained significant and substantial damage in an amount to be proven at trial. This includes but is not limited to physical damage, loss of use, investigative costs, repair development costs, diminution in value, and costs of correcting defective conditions. Personal belongings were also damaged as a result of the flooding event.

COMPLAINT FOR DAMAGES  - 13

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

## VIII.   **FOURTH  CAUSE  OF  ACTION:  BREACH  OF  WARRANTY**

84.     McCallum re-alleges each and every allegation set forth above as though set forth here in full.

85.     Pursuant to its Contract, York provided an express warranty that, among other things, all labor, material, and product will be paid for.

86.     York also provided an express warranty that all work would be performed in a commercially reasonable manner and that there would be no defects in workmanship.

87.     York extended its warranties for a period for Twenty-Four (24) months from the date of the contract.

88.     York has breached its warranties made to McCallum.  To date, York has failed to complete its work and placed various mechanic's liens on the Residence for work it has not completed.  Further, the work was not performed in a commercially reasonable manner.

89.     York's work performed was not of good quality, not free from faults and defects, and not in accordance with good building practices.

90.     The problems and defects occurred within the applicable warranty period.

91.     York has breached its implied and express warranties to McCallum.   York has failed to perform necessary remedial activities to adequately and completely correct deficiencies as it abandoned the job.

92.     By reason of York's breach of its warranties, McCallum has been damaged as described and stated herein.

COMPLAINT FOR DAMAGES  - 14

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

## IX.   FIFTH CAUSE OF ACTION: DECLARATORY JUDGMENT – INVALIDITY OF YORK MECHANIC'S LIEN

93.     McCallum re-alleges each and every allegation set forth above as though set forth here in full.

94.     On or about August 14, 2019, York filed a mechanic's lien against the Residence (Instrument No. 201908140147) in the Pierce County Land Records, in the amount of $17,200.31.

95.     On or about September 27, 2019, York filed a second mechanic's lien against the Residence (Instrument No. 201909270574) in the Pierce County Land Records, in the amount of $111,691.74.

96.     On or about October 10, 2019, York filed a third mechanic's lien against the Residence (Instrument No. 201910100255) in the Pierce County Land Records, in the amount of $ 50,035.77.

97.     As a result of its material breaches of contract and negligence, York is responsible for McCallum's costs to remedy water damage caused by York and costs to complete and/or correct York's incomplete and/or deficient work on the Project under both the T&M and Remodeling Contracts.

98.     McCallum has suffered damages in excess of any amounts unpaid under either the Parties' Remodeling or T&M Contracts.

99.     Accordingly, York is not entitled to a mechanic's lien against the Residence, and its mechanic's liens are therefore invalid.

COMPLAINT FOR DAMAGES  - 15

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340 1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

1

## X.    SIXTH CAUSE OF ACTION: INDEMNITY

2      100.    McCallum re-alleges each and every allegation set forth above as though set forth

3   here in full.

4      101.    Upon information and belief, following the flooding event it caused, York

5   entered into a subcontract with ServPro to perform certain remediation work at the Residence

6   including, but not limited to, services to dry out the Residence.

7

8      102.    Upon information and belief, York failed to pay ServPro all amounts due and

9   owing ServPro for the services provided to York at the Residence.

10     103.    Accordingly, on or about October 1, 2019, ServPro filed a mechanic's lien against

11   the Residence (Instrument No. 201910070778) in the Pierce County Land Records, in the

12   amount of $104,034.10.

13

14     104.    Because the amounts claimed in ServPro's mechanic's lien arise out of York's

15   subcontract with ServPro, York owes McCallum a duty of indemnity related to York's failure

16   to pay ServPro and the ServPro's mechanic's lien.

17     105.    Accordingly, McCallum demands that York defend, indemnify, and hold

18   harmless McCallum from any and all damages, fines, penalties, losses and expenses (including

19   reasonable attorneys' and expert witness fees incurred in defending against) arising, directly or

20   indirectly, from or related to ServPro's mechanic's lien.

21

22   ## XI.    PRAYER FOR RELIEF

23     WHEREFORE, McCallum prays for judgment against York as follows:

24     1.    For damage to property in an amount no less than $400,000, the exact amount to

25   be proven at the time of trial;

26

COMPLAINT FOR DAMAGES - 16

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

2.      For the full amount of interest allowed by law, including all prejudgment interest up until the time judgment is rendered herein;

3.      For declaratory judgment that York's mechanic's liens against the Residence are invalid;

4.      That York defend, indemnify, and hold harmless McCallum from any and all damages, fines, penalties, losses and expenses (including reasonable attorneys' and expert witness fees incurred in defending against) arising, directly or indirectly, from or related to ServPro's mechanic's lien.

5.      For McCallum's costs and expenses incurred herein;

6.      For reasonable attorneys' fees as allowed by law; and

7.      For such other and further relief as the Court deems just and equitable in the circumstances.

DATED this 22nd day of  January, 2020.

COZEN O'CONNOR


/s/ Karl Neumann
Karl Neumann, WSBA No. 48078
Attorneys for Plaintiff

999 Third Avenue, Suite 1900
Seattle, WA 98104
(206) 340-1000
(800) 423-1950 (Toll Free)

COMPLAINT FOR DAMAGES  - 17

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\44303231\1
01/22/2020

Exhibit 2

*EXHIBIT A*

Exhibit 2

 

3517 South 13th Street; Tacoma, WA 98405
P.O. Box 7270; Tacoma, WA 98417
253.752.3189
Fax 253.759.6051
www.yorkenterprises.com

September 12, 2018

**Maxine McCallum**
**521 North Yakima Avenue**
**Tacoma, WA 98403**

**Dear Mrs. McCallum,**

Thank you for giving York Enterprises the opportunity to complete your project.  Please review the enclosed Time and Materials contract scope of work.  If you would like to proceed, sign at the bottom of the contract and mail it back to us along with your deposit ($300.00).  Please read the contract details carefully.  Invoices will include cost of materials and subcontractors, plus markup.  Invoices will also show our time, (on-site, travel, and preparation) per man per hour and mileage.  Reports will be provided with each invoice.  We will schedule the work as soon as possible.  Should you have any questions regarding the contract, please call.  Thank you again!

Sincerely,

*Tyler*

Tyler York, CGP, Sales
H. York Enterprises LLC
253-752-3189

2015 BIAW State Remodeler of the Year
www.yorkenterprises.com–Houzz: York Enterprises LLC – Facebook: York Enterprises, LLC

Exhibit 2



# YORK

### e n t e r p r i s e s

P.O. Box 7270, Tacoma, WA 98417-0270
Telephone (253) 752-3189 Facsimile (253) 759-6051
YORKEE*968PR

| Client name<br>**Maxine McCallum** | Client phone/fax<br>**(609) 772-9598** |
|---|---|
| Client mailing address | Project name<br>**Rust Mansion Site Prep & Demo** |
| Jobsite address<br>**521 N. Yakima Ave, Tacoma, WA 98403** | Jobsite phone/fax<br>**same** |

**A. SCOPE OF WORK**. York Enterprises ("Contractor") agrees to perform the following work.

-**Install floor, millwork, decorative glass, door, and window protection materials in all areas of demolition or adjacent work where sensitive surfaces need to be protected. Include all sensitive doorway jambs.**
- **Carefully remove and crate or box up any lighting or home fixtures deemed valuable or historically significant to the home. Items that need to be removed temporarily for work to be performed will likewise be carefully removed and packed away, preferably in a separate location. These items (both categories) will be comprehensively listed, and Client will direct where these are to be stored.**
- **Remove and set aside less sensitive items, such as kitchen cabinets & appliances, that are to be reused for part of the overall project.**
- **Remove and donate (or dispose of, if necessary) any cabinetry, flooring, appliances, lighting or other home fixtures not intended to be kept with the home or reused. These items will be comprehensively listed as well.**
- **Install lead-safe containment measures, such as plastic screens, zip-walls, and negative pressure ventilation, as necessary per EPA standards and recommendations.**
- **Test surfaces and materials for lead and asbestos as needed. Bring in an asbestos abatement company if required.**
-**Remove and properly dispose of wall surfaces, millwork, wiring, plumbing, and any other building materials as necessary for completion of the total scope of work. All such areas of demolition will be comprehensively listed.**
-**Throughout this demo process, the Client, Sales Person, Job Supervisor, and key Trades Partners will work together to determine additional areas or items NOT comprehensively listed that will need to be removed and either boxed, set aside, donated, or disposed of properly. These items or areas will be added to a separate running list and initialed or otherwise approved by the Client before removal.**

Work not specifically stated above will be performed pursuant to paragraph 5 of the General Conditions.
Building permit, if applicable, will be paid by the Customer and obtained by the Contractor.

**B. FIXED PRICE AND PAYMENTS**. Customer agrees to pay for the work on the following schedule including progress payments and final payment.

☐ Agreed Price              $_____

☐ Sales tax                 $_____

☐ Total price               $_____

(less) Down payment of 50%  $(_____)

☐ Balance owed              $_____

☐ The balance owed will be paid as follows pursuant to section 3:

_____

_____

☐ Upon Completion an invoice will be sent

**C. TIME & MATERIALS**. No fixed price has been quoted or agreed upon. The Contractor shall perform the work specified in Section A on a time and materials basis. This means that the Contractor will perform all work required by the Customer, and present the costs of materials, equipment, subcontractors, permits and applicable fees to the Customer, together with an accounting of the hours spent by the Contractor's own work force in performing the work, and the Customer shall pay for this work at the rate of **$75/man hour** (per man per hour, incl. travel). Materials, subcontractors and mileage will be charged at invoice price with overhead. Applicable sales tax will be applied.

☒ An initial payment of **$_300.00_** is due upon signing. The balance owed is to be paid upon completion unless a different arrangement is made as follows pursuant to section 3:

_____

_____

Exhibit 2

**D.** Customer has read the General Conditions of this Agreement and agrees to its terms.  Unless this Agreement for services is signed by the Customer within 20 days of the date of York Enterprises' signature, York Enterprises, at its option, may decline to proceed with the work, and this Agreement shall be considered null and void.

_____   _____          _____   **9/12/2018**
CUSTOMER'S SIGNATURE                Date             H. York Enterprises, LLC              Date
                                                     dba York Enterprises

Exhibit 2

# GENERAL CONDITIONS

**1. BUILDING CODES.** In the event that a building department or other government agency subsequently requires work to be performed by Contractor which is not stated in Section A of this Agreement, or in the event that Contractor uncovers or discovers defects or problems in the existing structure which should be corrected to conform to safety requirements or standard construction practices, Contractor will advise the Customer of any changes in the required work and proceed to perform such changes pursuant to Section 5 of this Agreement.

**2. SCHEDULING.** Contractor will expeditiously complete the work, subject to availability of materials and site. It is the responsibility of the Customer to permit Contractor access to the site and to forward timely and complete directions to Contractor so that the work of Contractor can be performed as initially planned by Contractor.

**3. PAYMENT OF CONTRACTOR'S INVOICES.** Unless otherwise agreed, Contractor shall invoice the Customer on a periodic basis. Payment is due in full by the Customer to the Contractor within ten (10) days of the date of the invoice, including invoice for final payment. Any invoices not paid within 10 days will be charged interest in the amount of 1.5% per month or a $25.00 fee, whichever is greater. In the event of a returned check, a $45 fee will apply. We reserve the right to send any unpaid balance to a collection service or attorney if payment issues are not resolved within a reasonable amount of time. In the event of collection procedures you may be held liable for any past due service charges, collection agency charges, reasonable attorney fees and court costs.

**4. CORRECTION OR COMPLETION OF WORK.** Prior to making final payment, the Customer may personally review the work performed by Contractor and make note(s) of any items which the Customer believes need to be corrected or completed. This is called a punch list. The punch list shall be signed by the Customer. There will be only one punch list. The Contractor shall be given access and opportunity to perform all work identified on the punch list. The Customer shall not offset the cost of completing any work stated on the punch list against any balance owed to the Contractor, nor shall the Customer contract with any alternative contractor for the performance or completion of work within the scope of this Agreement, nor shall an owner or tenant occupy or use the Contractor's work until and unless the Contractor shall have been first provided the notice and opportunity stated above. If the Customer does contract with an alternate contractor to perform the punch list work or otherwise complete the project without first affording the above-described opportunity to the Contractor, or if an owner or tenant commences to use or occupy the Contractor's work or the space in which the Contractor performed work, the Customer accepts all work "as-is" and waives any claim against the Contractor. Upon the Contractor's completion or correction of the work identified on the Customer's single punch list, any hold-back withheld from final payment shall be paid within the next three (3) days to the Contractor. All further work shall be performed as warranty work as provided for in Section 7 of this Agreement. Any accrual balance owing and unpaid to the Contractor, regardless of whether the amount in dispute is liquidated or unliquidated, shall bear an interest of 18% per annum from the date of invoice.

**5. CHANGES IN THE WORK.** The Customer may request changes or modifications in the scope of work. These requests may be agreed upon orally or in writing. If agreed upon in writing, such changes or modifications shall be identified and agreed upon in a written change order prepared by the Contractor and signed by both parties. Unless so otherwise agreed and signed by both parties in writing, all extra work and change orders performed by Contractor shall be billed by Contractor and paid by the Customer as per this Section. Fifty percent plus tax of the cost of the change order is due upon signing of the change order. The balance shall be due at the time of the next invoice.

**6. DISPUTES AND REMEDIES.** If a dispute should arise between the parties, the parties shall promptly meet and attempt in good faith to resolve it. Openness, fairness and good faith are required of both parties. Any unsettled disputes between the parties shall be decided by an action filed in an appropriate court of jurisdiction. If suit is filed in a superior court, the suit shall be decided according to the Mandatory Arbitration Rules (MAR) regardless of the amount in dispute. The MAR Arbitrator shall have the authority to determine the validity or enforceability of any lien, and the parties mutually agree to accept the Arbitrator's award as final and binding, and waive any right to appeal or seek *trial de novo*. In the event a dispute *or* lawsuit arises and one or both parties seek and receive the assistance of legal counsel, the prevailing party shall be paid his or her attorneys' fees and costs by the non-prevailing party. The provisions of CR 68 and RCW 4.84.250, *et. seq.* shall not apply.

**7. WARRANTY.**

    A. The Contractor warrants that all labor, materials and taxes will be paid for, and there will be no potential lien claimants upon the completion of the work and final payment by the Customer. All work will be performed in a commercially reasonable manner.

    B. ☐ The Contractor's warranty is for a period of 24 months from the date of this Agreement, and thereafter expires. Any claim or cause of action arising under the terms of this Agreement, including the warranty, must be filed in a court of competent jurisdiction within the warranty period. Any unresolved , unasserted or undiscovered claim or cause of action which is not filed within the period of this warranty is waived. Warranty work performed by the Contractor does not extend the warranty. The warranty is void if a person or firm other than this Contractor performs or re-performs any work within the scope of this Agreement. The Contractor is not responsible for consequential damages. This warranty is non-transferable. Customer is responsible for all warranty work on items or work Customer provides. Contractor does not warrant against mold or caulking that cracks or bleeds. THIS WARRANTY IS GIVEN IN LIEU OF ANY EXPRESS OR IMPLIED WARRANTIES OTHERWISE PROVIDED UNDER THE LAWS OF WASHINGTON, INCLUDING ANY WARRANTIES OF FITNESS, MERCHANTABILITY OR HABITABILITY.

    C. ☒ The Contractor does not provide a warranty for this job. _____Customer's Initals

    D. Manufactured or consumer products are not separately warranted by the Contractor. In the event that the Customer encounters a defect in a manufactured or supplied product, the Contractor shall assist the Customer in securing repair or replacement of these products pursuant to the particular manufacturer's or distributor's warranty. The Warranty does NOT extend to owner provided or re-installed products or materials

**8. PREMISES.** In the event that the work involves improvement to an existing structure, the Contractor is not responsible for unknown or unobserved structural, electrical, plumbing or mechanical conditions in an existing building or on the Customer's premises. The Contractor will familiarize himself with the Customer's project and premises but will not disturb any of the existing construction or soil in order to further inspect. The Contractor cannot ascertain unobserved or unknown conditions of the Customer's premises, including structural, electrical, plumbing and mechanical systems for purposes of determining whether or not all necessary work has been identified in the contract documents. Accordingly, at the time that the existing structure and/or mechanical/electrical/plumbing systems are uncovered following commencement of the work, the Contractor may be required by the applicable building authority or by normal or standard construction practices to perform additional work not stated in the contract documents in order to complete all of the work according to the building codes or standard construction practices which are designed to ensure the safety and integrity of the structure. Typical of this kind of required extra work is the following: Correction of existing out-of-plumb or out-of-level conditions in existing structure; Correction of concealed substandard framing; Rerouting/removal of vents, pipes, ducts, structural members, wiring or conduits, steel mesh which may be discovered in the removal of walls or the cutting of openings in walls; Removal and replacement of existing rot, insect, rodent or other pest infestation; Failure of surrounding part of existing structure, despite Contractor's good faith efforts to minimize damage, such as plaster or drywall cracking and popped nails in adjacent rooms, or blockage of pipes or plumbing fixtures caused by loosened rust within pipes; Exact matching of existing finishes; Repair of damage to existing roads, sidewalks and driveways that could occur when construction equipment and vehicles are being used in the normal course of construction. The contract price has not been increased by the Contractor in order to cover these unknown or unobserved conditions. If extra work is required because of these conditions, the contract price will be adjusted according to Section 5 of this Agreement.

**9. VERIFICATION OF CREDIT.** The customer shall make suitable financial arrangements for payment of the work. The customer authorizes the contractor to contact the customer's lender for the purpose of verifying funds, the lender's disbursement procedures and lender's requirements for the Customer and Contractor.

Exhibit 2

Date: 9/12/2018

## NOTICE TO CUSTOMER (From the State of Washington RCW 18.27.114)

This BUILDER, **H. York Enterprises, LLC** is registered with the State of Washington, Registration #YORKEE*968PR as a general contractor and has posted with the State a bond of $12,000.00 for the purpose of satisfying claims against the contractor for breach of contract including negligent or improper work in the conduct of the contractor's business. The expiration date of the contractor's current registration is 01/18/2019, and is renewed annually.
**THIS BOND MIGHT NOT BE SUFFICIENT TO COVER A CLAIM THAT MIGHT ARISE FROM THE WORK DONE UNDER YOUR CONTRACT.**
This bond is not for your exclusive use because it covers all work performed by this contractor. The bond is intended to pay valid claims up to $12,000 that you and other customers, suppliers, subcontractors, or taxing authorities may have.
**FOR GREATER PROTECTION, YOU MAY WITHHOLD A PERCENTAGE OF YOUR CONTRACT.** You may withhold a contractually defined percentage of your construction contract as retainage for a stated period of time to provide protection to you and help insure that your project will be complete as required by your contract.
**YOUR PROPERTY MAY BE LIENED.**
If any supplier of materials used in your construction project or any employee of the contractor or subcontractor is not paid by the contractor or subcontractor on your job, your property may be liened to force payment and you could pay twice for the same work.
**FOR ADDITIONAL PROTECTION, YOU MAY REQUEST THE CONTRACTOR TO PROVIDE YOU WITH ORIGINAL "LIEN RELEASE" DOCUMENTS FROM EACH SUPPLIER OR SUBCONTRACTOR ON YOUR PROJECT.**
The contractor is required to provide you with further information about lien release documents if you request it. General information is also available from the Department of Labor and Industries.
**Other Insurances**
BUILDER also warrants that he is currently paying all appropriate taxes, including Workmen's Compensation, Employment Security, and Washington State Sales Tax, and that all employees on the site are covered by Workmen's Compensation. OWNER warrants that his homeowner's insurance policy (casualty, property damage and liability) is in force and covers the portion of the house under construction as well as the rest of the property. OWNER shall notify his insurance agent as to this agreement and obtain any necessary additional coverage such as builder's risk.

**The owners(s) have read the notice to customer above.**


OWNER'S SIGNATURE _____ DATE _____

PRINT LEGAL NAME _____


OWNER'S SIGNATURE _____ DATE _____

PRINT LEGAL NAME _____

MAILING ADDRESS _____

PHONE NUMBER _____


This document will be kept on file for a minimum of three years and will be made available upon request, to the Department of Labor & Industries.

Exhibit 2

*EXHIBIT B*

Exhibit 2

 

3517 South 13th Street; Tacoma, WA 98405
P.O. Box 7270; Tacoma, WA 98417
253.752.3189
Fax 253.759.6051
www.yorkenterprises.com

YORKEE*968PR

### *H. YORK ENTERPRISES LLC*
# REMODELING CONTRACT

THIS CONTRACT, made and entered into this **29th day of January, 2019**, by and between **H. York Enterprises LLC**, hereinafter referred to as "BUILDER"; and **Maxine McCallum**, hereinafter referred to, jointly and severally, as "OWNER(S)";

**WITNESSETH:**

BUILDER hereby agrees to remodel for OWNER a building in accordance with plans/drawings/BUILDER/OWNER sketches and specifications which are described below and attached hereto, and in accordance with any written Change Orders which OWNER may hereafter make from time to time. Such remodeling / construction shall take place on real estate owned by OWNER described as follows: **521 North Yakima Avenue, Tacoma, WA 98403**

The remodeling construction area (that portion of the building and lot on and in which the work is to be completed, materials are stored and which provides access for workmen, materials, equipment, trucks, etc.) is outlined or descriptively defined as follows:

**Residential Renovation**

1. *Scope of work*

We propose to furnish all material and perform all labor necessary to complete the following:

**Whole Home:**
- **For this and all sections below, refer to the City and/or owner approved architectural drawings, engineering notes, approved design drawings, and approved landscape/site work drawings.**
- **Rewire the entire Home from the existing electrical service throughout. Includes all new receptacles, switches, can lights, trims, low voltage lights and devices, and installation of any Owner provided light fixtures. To include new electrical panel(s) and breakers as needed. All circuits to be brought up to present code requirements. Includes all new hardwired smoke/CO alarms and any Smart Home devices requested by the Owner. Includes Carriage House wiring as needed for scope defined below, and for owner provided Tesla charger.**
- **Replumb the Home, connecting to existing drain lines as code and proper practice allows. Includes a new high efficiency tankless water heater with recirculation loop**

Owner: _____

1 of 18

Exhibit 2

and all new hot and cold water lines throughout. *Does not include new plumbing lines or drain changes for the 2nd floor front bathroom.*

- Flush and attempt to get all existing radiators to work. *Some radiators may not be repairable without extensive line replacement, which would be at additional cost.*

- Install an owner provided Nest or similar thermostat connected to the existing heat system. Install a separate standard thermostat for the added in-floor kitchen zone.

- Refinish all existing hardwood floors on the main and 2nd floor levels, except in the Library. Includes weaving in salvaged fir flooring in the Family Room and refinishing, and adding/weaving in salvaged maple flooring in the Master Suite and refinishing. Includes refinishing the main stairs between the main and 2nd floor Foyers. *Does not include any refinishing in the basement/ballroom areas.*

- Install framing blocking as required for advised structural reinforcement, fire code requirements, or fixture mounting. Add framing reinforcement as directed or advised by the engineer (per drawings or on-site recommendations).

- Insulate the Home, wherever practical and/or required. In all rooms with opened exterior walls or opened 2nd floor ceilings, fill the bays to depth with fiberglass batt insulation. Insulate under the Kitchen floor with fiberglass batts, where accessible. In all opened walls between bedrooms or bathrooms and any other room, insulate for sound deadening. In all rooms except the Library, Family Room, and rooms where existing insulation exists in unopened walls, drill and fill each exterior wall stud bay with blown-in cellulose insulation. In all 2nd floor rooms with un-opened ceilings, blow cellulose insulation to depth in the ceiling cavities. Insulate the newly enclosed Mudroom to code. Insulate all exposed hot water pipes and hydronic heat pipes. Use rigid foam insulation as necessary to meet code.

- Install new drywall on all walls and ceilings throughout the Home where plaster or drywall was removed. Repair and skim any existing walls to cover cracks or wallpaper seams. Finish is to be smooth-wall in all areas.

- Touch up and spot-repair all existing wood interior doors in the Home. Attempt to strip paint off all original hardware and reinstall.

- Paint the interior of the Home – all walls, ceilings, casings, trim, millwork, doors, and windows. Includes meticulous prep, sanding, caulking, thorough masking, and priming using Extreme Bond Primer. Includes one color/sheen for ceilings, one color/sheen for trim/millwork, and up to five (5) colors for walls (one per room). *No painting included in the Library or in the basement areas.*

- Repair and clean the tile roof on the Home and Carriage House, replacing broken tiles as necessary, resetting slipping tiles, and repairing flashings as needed. Re-stack the extra roof tiles neatly on pallets under the side deck.

- Replace the gutters on the Home and Carriage House with weathered copper gutters, color and profile to be selected by the Owner. Reuse the existing copper downspouts, replacing non-copper sections with copper and repairing damage as necessary.

- On the Home and Carriage House, repair or replace any rotten or deteriorated exterior trim or soffits accessible without removing large amounts of roof tiles. *Any parts not accessible should be taken care of when the tile roof is lifted and relayed in the future.*

- Paint the exterior of all Home windows and doors, old and new, including scraping and/or sanding, priming, caulking, masking & prep, and painting. Excludes the new side entry door slab (to be pre-finished) and front door.

Owner: _____

Exhibit 2

- Paint the exterior of the existing south facing windows on the Carriage House.

### Front Porch:
- Remove and dispose of the existing soffit, perimeter trim material, torch down roof membrane, and roof sheathing. Examine the roof structure and determine how much repair is required. *Any framing repair required will be performed on a Change Order or on the existing Time and Materials Contract (T&M).*
- Install new properly sloped roof sheathing, new torch down roof membrane, and scupper to existing gutter.
- Install new wood plywood soffit, similar to the existing soffit. Install low-profile perimeter crown trim. Prime and paint the porch ceiling.
- Thoroughly clean the outside of the front door with wood oil soap. *If it is determined the door should be refinished, this will be performed on a Change Order or on the existing T&M.*

### Front Entry:
- Patch any holes drilled for electrical rewire.
- Painting to exclude the Corinthian crown trim and above, except the lid where there was patching.
- Carefully remove the pocket door casing and attempt to clean or improve the roller functionality. *Includes up to eight (8) hours of disassembly, trouble-shooting, and reassembly – we cannot guarantee results on this due to the nature of the old door mechanics.*
- Have the existing mosaic tile professionally power cleaned. Clean the inside of the front door with wood oil soap.

### Main Floor Foyer / Main Stairway / Upper Floor Foyer:
- All scope items covered in the Whole House section, above.

### Living Room:
- Install new built-up crown trim, using a profile that includes up to four (4) pieces of stacked crown trim. *Included trim pricing assumes paint grade pine or similar for all base, door, and window trim, and paint grade pine, similar, or MDF for all crown.*
- Repair the firebox at the fireplace so it is useable for wood burning fires.
- Using the stone removed from the upstairs bathroom, create and install a new fireplace surround and hearth.

### Dining Room:
- Using the stone removed from the upstairs bathroom, create and install a new fireplace surround and hearth.
- Reinstall the fireplace logs and test to see if they work. *Repairs needed or replacement with a different vent-free log set will be at additional cost.*
- Painting scope included in Whole House section above. *If it is determined an artist-level fine airbrush is needed to properly paint the mantle super-detail, this may be at additional cost. This cannot be determined until we test in an inconspicuous spot.*

Owner: 

Exhibit 2

## Kitchen:

- Install in-floor hydronic heating, tied to the existing whole home hydronic heat system, on its own thermostat.
- Install a self-leveling high strength subsurface over the new heat system. *Due to the floor's settling and irregularity, this must be done in two pours, and may result in the floor heat being slightly irregular because of varying thicknesses.*
- Install large format tile throughout the Kitchen in a standard pattern.
- Clean up the kitchen picture window opening so it can be trimmed properly.
- Install new wood trim around the outside of these windows, replicating the trim style on the existing windows as closely as possible.
- Frame out the walls next to the chimney to be flush with the brick and return next to the door, per design drawings. Frame out plumbing soffit boxes as necessary.
- Install a custom cabinetry package, including a large island, custom full-height hutch, and in the butler's pantry area.
- Install the owner provided appliances, including the column refrigerator, freezer, joiner, dishwasher, wine cooler, microwave, and under-counter drawer refrigerator. Reinstall the range. *YE cannot extend our warranty to any owner purchased items, appliances, fixtures, or other materials.*
- Install owner selected range hood liner, garbage disposal, and under sink in-line water filter. Install new proper venting for the hood, up through the chimney.
- Install Kitchen undermount sink and faucet. Connect fridges to water lines as necessary for ice/water.
- Install custom quartz countertops, including proper supports for the island overhang, and subway tile backsplash.
- Install new wood base, window, and door trim with similar profile to that existing in the Home.
- Install new crown trim with up to two (2) pieces for a built-up look.
- Install a 48" wide magnet-receptive (steel) chalkboard skin over plywood on the south wall of the butler's pantry, from the base trim up to the ceiling.
- Install stone flooring transition strips at the Library and Dining Room doors.

## Mudroom & Side Entry:

- Remove and dispose of all the glass units, both at the side wall and roof.
- Frame the exterior walls with 2x6 framing, either new or furred existing, per architectural drawings.
- Cut/shape the rafter ends to mimic the upper roof overhangs.
- Install plywood roof sheathing with tongue & groove surface at the overhangs.
- Add blocking to the roof framing and cut in two (2) skylights.
- Install a standing seam copper roof with copper flashings. Install the skylights.
- Install new brick at the mudroom walls, replicating the look of the brick on the home as closely as possible.
- Install a cast sanded concrete sill for the windows.
- Install three (3) new double-hung wood windows, similar in style to those currently on the home.
- Install a new entry door and hardware.
- Insulate the new Mudroom to code.

Owner:  _____                                    4 of 18

Exhibit 2

- Cut a new crawl space access into the side of the existing brick, and install a lockable hatch on the access.
- Install new subfloor and hydronic heat coils for in-floor heat.
- Install new patterned tile flooring.
- Install drywall on the new and existing wall surfaces with a smooth-wall finish.
- Install the mudroom cabinetry package.
- Install new wood window and door trim, inside and out, and new base trim inside.
- Install new copper gutters and downspouts on the new mudroom roof.
- Outside the mudroom, leading down to the driveway, install the concrete and brick patio, cheek walls with cast concrete caps, ramped walkway, and steps per landscape/site work drawings.
- At the flat dirt area to the south of the mudroom entry, install up to 800 square feet of sod. *Care and maintenance of the installed sod is the responsibility of the Owner; YE cannot guarantee any living/planted materials beyond 30 days.*

### Library:
- Modify the existing gas line for a new vent-free gas log set, to be selected by the owner. *Assumes this can be done without significant firebox modification.*
- Install the wood and leaded glass panels, removed from the butler's pantry area, in the opening between the pantry and Library.
- Install light fixtures and electrical switches/outlets, as described in the Whole House section.

### Office/Orchid Room:
- Replace the base trim with a profile that better matches that in the rest of the Home.
- Replace the exterior threshold with a new, custom fit threshold. Install a new sweep on the existing entry door.
- Have the existing floor tile professionally power cleaned (including in hallway).

### Powder Room:
- Install a new tile floor in a herringbone pattern.
- Install a new console sink and faucet, per design drawings. Install a new or owner provided mirror over the sink. Install a new toilet in roughly the same location. Install new bathroom accessories.
- Frame and install a bookshelf/hidden door at the wall under the stairs, next to the toilet. Exact design of the shelf/door TBD (set as a Material plus Labor [M+L] Allowance).
- Install a new ventilation fan, properly vented to the exterior.
- Install new wood base, crown, and built-in shelf trim.
- Install a stone doorway flooring transition strip.

### Main Floor Hallways:
- At the hall outside the Powder Room, replace the cut-up base trim.
- At the hall between the Office and Library, replace the door trim with flushed trim.
- At the closet adjacent to these two hallways, modify as necessary and install a door from the basement "stock". Do the same at the doorway across the hall, leading to the

Owner: 

Exhibit 2

basement. *If none of these "stock" doors can be satisfactorily altered to work here, add new door(s) to one of the existing door Allowances.*
- In the closet, install a storage shelving system on two (2) of the back walls.

Basement Bathroom:
- Install a new toilet.
- *The drywall installed here will not be finished as cleanly as in other areas of the home, as this bathroom is slated to be remodeled in the future.*

Theater Room:
- Install new drywall on the ceilings and over the soffit box. For the ceiling drywall, install using sound isolating hat channel or similar.
- Remove the abandoned venting and repair the broken glass in the window.
- *In the room adjacent to the Theater Room, with the electrical panels, no drywall repair/replacement is currently planned, as this wall above the panel will need to be open when new conduits and power/water lines are run to/from the Carriage House in the future.*

Master Bedroom:
- Using the stone removed from the upstairs bathroom, create and install a new fireplace surround and hearth. Cap off the existing gas line.
- Widen the doorway between the Bedroom and Walk-In-Closet (W.I.C.) areas. Install a new custom built double door that incorporates the leaded glass panels found in the basement.
- Install new wood base and door trim, replicating the existing trim profiles as closely as possible.
- *At review, the City may require that an existing window be replaced with an operable window that meets egress requirements for fire safety, at additional cost.*

Master Bathroom:
- Install new large format tile on the bathroom floor, and on the shower walls from floor to ceiling. Install a heated floor mat under the floor tile on a thermostat.
- Install new decorative tile on the shower floor, sloping back to a tiled-over trench drain along the wall.
- In the shower, install a custom sized niche, rain head, and shower bar with handheld head, per design drawings.
- Install a wall hung toilet with in-wall cistern.
- Install a freestanding tub and wall-mounted faucet/filler.
- Install a custom cabinetry vanity, per design drawings. Install two (2) undermount sinks and faucets.
- Install quartz countertops on the vanity.
- Install a large trimmed mirror on the wall, with custom cut outs for light fixtures.
- Install new bathroom accessories.
- Install a new ventilation fan, properly vented to the exterior.
- Install new wood base, door, and two (2) piece crown trim. *No base or crown trim in the shower area.*
- Install a stone doorway flooring transition strip.

Owner:  _____

Exhibit 2

**Master Walk-In-Closet:**
- Install a new custom closet package, with custom drawer fronts.
- Install new carpet.
- Install a finished nook in the void next to the chimney.

**Upstairs West Bedroom:**
- Re-hang the closet door so it swings appropriately.
- Install a new shelf and rod in the closet.

**Upstairs South Bedroom:**
- Install a new shelf and rod in the closet.

**Upstairs Front Hallway:**
- All scope items covered in the Whole House section, above.

**Upstairs Front Bathroom:**
- Install a new toilet, new mirror, and new bathroom accessories.
- Install a new ventilation fan, properly vented to the exterior.
- Have the existing floor tile professionally power cleaned.
- *Plumbing lines to this room will not be replaced at this time, as a future remodel is planned.*

**Family Room:**
- Remove and frame in the ships ladder hole in the ceiling.
- Install a new/salvaged window latch on the center double casement window.
- Install a shelf and rod in the closet.
- Install new wood base, door, and crown trim, matching the existing in the room as closely as possible.

**Guest Bedroom:**
- Install new engineered wood or LVT flooring.
- Reinstall the door removed for the wall modification.
- Install a shelf and rod in the closet.
- Install new wood base and door trim, matching the existing in the room as closely as possible.

**Laundry Room:**
- Install new large format tile flooring.
- Install new custom cabinetry package, per design drawings.
- Install new quartz or other owner selected countertops on both sides of the room.
- Install a laundry sink and subway backsplash tile, per design drawings.
- Install a new ventilation fan, properly vented to the exterior.
- Owner to provide and install washer and dryer.
- Properly vent the dryer to the exterior.
- Install a stone doorway flooring transition strip.

Owner: 

Exhibit 2

Guest Bathroom:
- Install new mosaic tile flooring. Install a heated floor mat under the floor tile on a thermostat.
- Install a new vanity, countertop, sink, and faucet.
- Install a new or owner provided mirror over the vanity.
- Install a new toilet.
- Install a new acrylic shower pan, showerpipe valve & head, half wall, niche, and subway tile shower surround (to ceiling).
- Install a new glass shower wall/door system.
- Install a new ventilation fan, properly vented to the exterior.
- Install new wood base trim, wainscot, chair rail, and door trim.
- Install new bathroom accessories.
- Install a stone doorway flooring transition strip.

Guest Wing Hallway:
- Install new engineered wood or LVT flooring.
- Install new wood base and door trim, matching the existing in this area of the Home as closely as possible.

Guest Wing Stairway (Two Levels):
- At the newly constructed stairs to the 3rd floor and reconstructed stairs down to the Kitchen, install new engineered wood or LVT flooring for the treads, nosing, & 3rd floor landing, and prep & paint new or existing (as applicable) wood risers.
- At these stairs, reuse and incorporate the existing newel post(s) into a custom interior railing system with a painted wood handrail, iron balusters, and trim style as selected by the owner.
- Frame in the stairwell walls at the 3rd floor, cutting a new door into the existing 3rd floor Bonus Room, and framing a door into the future 3rd floor Bathroom location, per design drawings. These walls and ceiling above to be insulated and finished in accordance with the Whole Home section, above.
- Install two (2) new interior doors & hardware, type and style selected by the owner.
- Install new wood skirt, base, and door trim at the stairs and landings.
- At the removed ships ladder, weave in laminate flooring that resembles the existing blonde laminate.

Carriage House:
- Install the washer and dryer, currently in the Home's laundry room, in the Basement of the Carriage House, next to the existing deep sink. Pour a new level concrete base for the washer & dryer, demoing the existing floor in this area as necessary.
- Build a half wall along the south wall of the main room, upstairs.
- Install a new tanked water heater and new plumbing up to the Kitchenette for a sink and dishwasher, running through the new half wall.
- Install drywall on the new half wall, and patch existing walls as necessary.
- Install new cabinets in the Kitchenette, per design drawings.
- Modify and install the granite countertops salvaged from the Home's Kitchen.
- Install a new kitchen sink and faucet.

Owner: _____

Exhibit 2

- Install a new owner provided range, canopy hood, and refrigerator. Properly vent the hood up and out through the roof.
- Install shelving on the wall around the hood, per design drawings.
- Touch up paint as necessary.

The following is the list of allowance amounts for materials to be chosen by you, the homeowner, or for items or work that is yet to be completely defined. Any sum of these amounts not spent will be credited back to your account. Any sum spent over these amounts will be directly added to your account's total. If allowances are exceeded by 20% or more, additional overhead will be assessed.

*Allowances:*

| | |
|---|---|
| Cabinetry Package & Install - | $95,000.00 |
| Quartz Countertops - | $11,560.00 |
| Master Closet Package - | $7,300.00 |
| Cabinetry Knobs & Pulls - | $2,500.00 |
| Gutters & Downspouts - | $19,000.00 |
| Mudroom Copper Roof - | $4,500.00 |
| Mudroom Skylights (2) - | $700.00 |
| Mudroom Entry Door & Hardware* - | $2,500.00 |
| Mudroom Windows (3) - | $3,000.00 |
| Fireplace Surrounds & Door Transitions (fab.) - | $6,600.00 |
| Vent-free Fireplace Gas Log Set - | $2,000.00 |
| Guest Wing Railing System - | $6,000.00 |
| Interior doors & hardware (2) - | $700.00 |
| Powder Room Shelf/Door (M+L) - | $1,670.00 |
| Closet Shelves or Shelf/Rods - | $600.00 |
| Drywall Patching/Skimming - | $9,500.00 |
| Tile Flooring & Grout (all rooms) - | $7,117.00 |
| Guest Wing Flooring - | $2,800.00 |
| Guest Wing Stairs Treads & Nosing - | $2,800.00 |
| Laminate Flooring (3rd floor patch) - | $100.00 |
| Carpet & Pad (W.I.C.) - | $1,000.00 |
| Bath Tile Heat Mats (2) - | $1,800.00 |
| Heat Mat Thermostats (2) - | $380.00 |
| Backsplash Tile & Grout (Kitchen & Laundry) - | $300.00 |
| Shower Surround Tile & Grout (Master & Guest) - | $1,250.00 |
| Plumbing Fixture & Bathroom Trim Package - | $16,000.00 |
| Shower Glass Surround (Guest) - | $3,100.00 |
| Bathroom Mirror(s) - | $950.00 |
| Appliance Package (hood, disposal) - | $1,900.00 |
| Magnetic Chalkboard - | $450.00 |
| Carriage House Cabinetry - | $2,200.00 |
| Carriage House Countertops (fabrication) - | $720.00 |
| Carriage House Kitchenette Sink & Faucet - | $350.00 |
| Carriage House Kitchenette Shelving - | $200.00 |
| Building, Plumbing, & Mechanical Permits - | $17,250.00 |
| All Electrical Work, Materials, & Permits (F.L.E.) - | $90,000.00 |

*To include prefinishing

Owner: _____

Exhibit 2

The following work and/or items, materials, etc. being performed or supplied by others are not included as a part of this contract: **Low voltage wiring, specific to the Home Theater System, Security System, or Smart Home devices not mentioned in the above Scope of Work**

WARNING TO OWNER: All work done by trades outside of this contract should be registered with Washington State Labor and Industries and provide verifiable liability insurance as well as a bond with the State of Washington. Their work is done outside of the scope of this contract and in no way should be connected with H. York Enterprises LLC or the work done under this contract by H. York Enterprises LLC or their trade subcontractors.

2. BUILDER agrees to furnish and pay for all costs of remodeling the dwelling, including labor, materials, supplies, subcontracting, equipment, appliances, tools, freight, permits, and other items required for such remodeling construction. OWNER agrees to furnish and pay for all utilities used by BUILDER and BUILDER'S subcontractors during the course of the remodeling.

3. OWNER shall pay BUILDER for the remodeling of such dwelling house a Contract Lump Sum of **Nine Hundred Fifty Six Thousand Sixty Eight Dollars and 44/100's, ($956,068.44)** plus current Washington State Sales Tax at the time of invoice (currently **10.1%**), (**$96,562.91**), for a grand total of **One Million Fifty Two Thousand Six Hundred Thirty One Dollars and 35/100's ($1,052,631.35).**

4. OWNER shall make payments of the Contract sum to BUILDER as follows:
   (A) Upon signing and execution of this Contract, OWNER shall make a payment to BUILDER of 10% plus tax, (**$105,263.13**) which shall be credited against the sum of the final payment.
   (B) At the start of work, OWNER shall make a payment to BUILDER of 40% **plus** applicable tax, (**$421,052.54**) which shall be credited against the sum of the final payment.
   (C) A "**timely cash/check payment discount**" is available, and only applies if payments are made within 10 calendar days of invoice date AND payments are made with either cash or check. The discount is on an individual invoice basis, and will be noted on each invoice. If fully utilized, the "timely cash/check payment discount" would reduce the total of this contract by **$47,803.42,** for a reduced Contract total of **Nine Hundred Eight Thousand Two Hundred Sixty Five Dollars and 02/100's ($908,265.02)** + tax. Payments made by mail must be postmarked on or before the invoice due date to be eligible for discount.
   (D) OWNER shall make progress payments to BUILDER based on the progress of the job, beginning at the start of work on this contract.  Payments are due within 10 days of invoice date.  Interest will be charged at the rate of 1.5% per month or a $25.00 fee, whichever is greater, on unpaid balances after 20 days.  If an invoice goes unpaid for 30 days or more, York Enterprises reserves the right to stop work until invoice payment is made in full.  In the event of a returned check, a $45.00 returned check fee will apply. We reserve the right to send any unpaid balance to Pacific Northwest Collections, Inc., if payment issues are not resolved within a reasonable amount of time.  In the event of collection procedures, you may be held liable for any past due service charges, collection

Owner: 

Exhibit 2

agency charges, reasonable attorney fees and court costs.  Final 10% plus tax to be invoiced and paid by OWNER to BUILDER on completion of the contract.

5. **Project Start Date:  In Progress**

## TERMS AND CONDITIONS:

1) **DISPUTES AND REMEDIES:**   If any dispute arises between the OWNER and BUILDER, the OWNER and BUILDER will make a good faith effort to first resolve the dispute without resort to litigation.  The OWNER and BUILDER should meet to attempt to resolve any dispute in a businesslike manner.  Any remaining dispute between the parties shall be decided according to the Mandatory Arbitration Rules of the County in which the suit is filed, regardless of the amount in dispute. The arbitrator's award shall not be limited by otherwise applicable MAR rules. The arbitrator shall have the authority to determine the amount, validity and enforceability of a lien. The arbitrator's decision may only be appealed pursuant to RCW 7.04. In the event a dispute arises and either party seeks and receives legal counsel for which a fee is charged, the prevailing party shall in all cases be awarded his or her actual attorney's fees paid and/or billed and any reasonable costs regardless of whether the dispute is resolved through settlement or arbitration. There shall be one and only one prevailing party, which shall be the single party in whose favor a net monetary settlement or arbitration award is received, after all offsets, back charges, counterclaims, etc. are resolved, and regardless of which party may have prevailed on which issues. The award of actual attorney's fees shall include all fees billed by the prevailing party's attorney to the prevailing party and shall not be limited or increased to reasonable attorneys' fees. The prevailing party's actual attorney's fees shall be conclusively presumed to be reasonable in the absence of the non-prevailing party's proof that such fees are manifestly unreasonable. In determining the party in whose favor a net monetary judgment is awarded, the arbitrator cannot consider tenders or payments of money made after the suit had been filed. The Disputes and Remedies clause supersedes all statutes and court rules dealing with the determination of prevailing party and the award of attorney's fees.
**Termination of Contract:  A.** OWNER may terminate this contract if BUILDER fails to perform any material terms of this contract and any material specifications of the job and such failure continues for 10 days following BUILDER'S receipt of written notice of the deficiencies. In the event of such termination, OWNER shall pay BUILDER the reasonable value of the work performed and materials supplied to the date of termination, less payments already made and owner shall assume any outstanding subcontracts to the extent such subcontracts have been performed at such date.  **B.** BUILDER may terminate the contract upon OWNER'S failure to make any payments required herby or OWNER'S failure to perform any material conditions of this contract if such failure to pay or perform persists for 10 days after OWNER'S receipt of written notice of such default or deficiency. In the event of such termination, OWNER shall Pay BUILDER an amount equal to the BUILDER'S labor performed, materials supplied, materials ordered for this job (for which cancellation is not reasonably feasible), freight and return charges for materials which can be reasonably returned, sub-contractors' costs and any cancellation fees for them, and BUILDER'S lost profits together with any sales tax thereon.  **C.** OWNER may terminate this contract at any time without cause by giving BUILDER written notice of the termination, in which event OWNER shall pay BUILDER the same as provided in Paragraph B immediately preceding. OWNER shall not hire another contractor prior to full payment to H. York Enterprises LLC. OWNER shall accept work as is if he occupies the space in which work was performed. BUILDER has the irrevocable right to repair any work prior to OWNER or his agent making repairs.

2) **CORRECTION OF WORK:**   After the work is ready for the owner's use or occupancy, the BUILDER and OWNER may jointly inspect the work and a single punch list shall be prepared identifying all work to be completed or corrected. There shall be only one such written list of work identified to be incomplete or incorrect, and the list shall be signed by the OWNER and given to the BUILDER. The BUILDER shall then expeditiously complete all work stated on the punch list for which the BUILDER is responsible under the terms of this agreement. The OWNER shall not contract with an alternative contractor for the performance or completion of work within the scope of this Agreement, nor shall the OWNER claim a credit or a back charge for the cost of completing any item stated on the written punch list, nor shall the OWNER occupy or use the BUILDER'S work until and unless the BUILDER specifically authorizes the exception or shall have first been given reasonable notice and opportunity to correct the work stated on the punch

Owner: _____

Exhibit 2

list referred to above. If the OWNER does contract with an alternative contractor to perform the pickup (punch list) work or otherwise complete the project without first affording the above described opportunity for the BUILDER to do so, the OWNER then agrees to accept all work "as-is", and thereby waives all claim against the BUILDER under the terms of this Agreement, including warranty claims. Upon the BUILDER'S completion or correction of the work identified on the single written punch list, any retainage or amount withheld from final payment shall be paid within the next three days to the BUILDER. All further work shall be performed as warranty work as provided for under the terms of this agreement.

**3) OCCUPANCY:**

Should the owner need to occupy the space prior to the above completion process, BUILDER will review/inspect the area/room OWNER plans to occupy and the ingress/egress path to it. Based on the stage of work, scope left to complete, and any OWNER and BUILDER identified details, the space will be deemed fit for occupancy with full warranty, or detailed mitigating circumstances will be identified in writing and agreed to by both BUILDER and OWNER that may delay the establishment of warranty and may include added costs, extended timeline to completion, or warranty exclusions.

**RCW Title 64 contains important requirements you must follow before you may file a lawsuit for defective construction against the builder of your home.  Forty-five days before you file your lawsuit, you must deliver to the builder a written notice of any construction conditions you allege are defective and provide your builder the opportunity to make an offer to repair or pay for the defects.  You are not obligated to accept any offer made by the builder.  There are strict deadlines and procedures under State law, and failure to follow them may affect your ability to file a lawsuit.**

**WARRANTY:**  The BUILDER warrants that all labor, material, product and appropriate taxes will be paid for and that there will be no potential lien claimant against the OWNER'S property upon completion of the work following final payment by the OWNER to the BUILDER. The BUILDER warrants that all work will be performed in a commercially reasonable manner and that there will be no defects in workmanship. Products supplied by suppliers, manufacturers and subcontractors to the project are warranted only to the extent that the suppliers or manufacturers of those products provide a warranty. Warranty work means work which was initially, correctly and completely done, but becomes non-operational or dysfunctional following occupancy or use by the owner. The warranty period shall extend for:

**X** Twenty-Four (24) months from the date of the contract.   Any warranty claim shall be made in writing to the BUILDER from the OWNER within the (24) twenty-four-month warranty period. Any claim or cause of action arising under the terms of this contract, including the warranty, must be filed in a court of competent jurisdiction within twenty-four (24) months following the date of the contract. Owner's Initials: _____

BUILDER will perform all necessary labor to repair or replace all defective work at no cost to the OWNER and will expeditiously act in good faith to secure product replacement under warranty of others, as stated above. Warranty work performed by the BUILDER does not extend the warranty period any further than what was previously stated. Warranty is void if a person or company other than the BUILDER performs or re-performs any work within the scope of the contract, or if the final payment is not made to the BUILDER.  Warranty is nontransferable.  BUILDER does not warrant against mold.  BUILDER does not warrant caulking that cracks or bleeds.  BUILDER does not warrant against cracks in concrete driveways or sidewalks that are less than ¼ inch in width. BUILDER shall not be liable for any consequential damages which may arise due to the breach of this contract, nor shall BUILDER be responsible for collateral damage resulting from a warranty defect. OWNER is responsible for all warranty work on items he provides for BUILDER to install.  THIS WARRANTY EXPRESSLY EXCLUDES ALL OTHER WARRANTIES AVAILABLE UNDER WASHINGTON STATE AND FEDERAL LAWS, INCLUDING ANY EXPRESS OR IMPLIED WARRANTIES OF FITNESS, MERCHANTABILITY OR HABITABILITY AND FURTHER EXCLUDES CONSEQUENTIAL DAMAGES FOR ECONOMIC PROPERTY OR PERSONAL INJURY OR LOSS.

**Standards of quality – York Enterprises** will meet or exceed those tolerances specified in the publication" Residential construction Performance Guidelines" published by the

Owner: _____

Exhibit 2

Remodelors Council of the National Association of Home Builders, fourth edition, copyright 2011.

**Color and Material Selections** should be final by the time of pre-construction meeting. Any changes to these selections not made prior to this date will be made by the BUILDER, at his sole discretion, based on his standards for cost, color and material selections. If OWNER selections fall outside these standards, additional charges may apply, and will be addressed in the form of a Change Order.

4) **CHANGE ORDERS:** The OWNER may request modification in the work, or extra work, after construction has begun. Requests shall be made directly to the BUILDER or his Production Manager or Lead Remodeler, but not to subcontractors or employees of the BUILDER. Change Orders should be reduced to a signed writing in order to avoid misunderstandings over cost or scope of work, but can be given orally by the OWNER at their risk. A written Change Order will be prepared on a form furnished by the BUILDER and shall state the effect of the modification upon the contract price. The price of all Change Orders over $1,000 shall be paid as follows: 50% plus tax due upon signing the Change Order, the remaining balance plus tax due at the next monthly invoice. Change Orders under $1,000 will be due in full upon signing. The OWNER may elect to orally authorize Change Orders. Unless a Change Order has been prepared in writing and signed by both parties, the cost of processing or completing any Change Order shall simply be calculated on the basis of a labor rate of $65 per hour for all BUILDER'S personnel, plus subcontractor costs, material costs, and general conditions costs, plus the BUILDER'S Change Order markup of 30%, for Change Order requests actually performed and completed by the BUILDER. If the number of Change Orders exceeds eight (8), an administrative fee of $250 per Change Order shall be charged for each additional Change Order. Credit changes on items shall be credited at bid cost. In the absence of a written agreement to the contrary, the effect on the completion date should be twice the proportion by which the contract price is increased.

5) **BUILDING CODES:** In the event that the BUILDER and OWNER enter the contract before the BUILDER'S receipt of the approved plans from the building dept., the contract price and the estimated date of substantial completion may be increased, in which case either the BUILDER or the OWNER shall be relieved of further obligation if the increase is greater than ten (10%) percent. The BUILDER shall complete the work according to the project documents identified in the Agreement. If the approved drawings have been issued by a building department, both the BUILDER and the OWNER may rely upon those approved drawings as conforming to all applicable regulations and building codes of the jurisdictional building authority. In the event that the building department or other governmental agency requires revisions of any work within the scope of this agreement, or in the event the BUILDER uncovers or discovers defects or problems with an existing structure or building site which should be corrected in order to conform to safety requirements, building codes, or accepted construction practices, the BUILDER will advise the OWNER of any required changes or modifications in the work. The OWNER may authorize the BUILDER to perform such work according to the section of the agreement dealing with change orders. The BUILDER is not responsible for any special inspections, analyses or reports which are not ordinarily provided for a building inspector.

6) **COMMENCEMENT AND COMPLETION DATES:** BUILDER will commence work after receipt of the approved set of plans from the building department, the mutual signing of this Agreement, and after notice from the OWNER to proceed with the work. BUILDER will proceed with the work and obtain inspection and approval from the applicable building authority in a commercially expeditious manner, unless delayed by the unforeseen availability of labor or materials, restricted access to the work site, delays in communication with the OWNER, inclement weather, insufficient or unworkable drawings, changes in the work, or other causes beyond the BUILDER'S control. **Delays** – BUILDER will start each new project only after the preceding project is completed. The next available start date as noted on the contract is an approximate date. After starting, the BUILDER will make continuous progress toward completion of the project through the punch list.

7) **PROGRESS PAYMENTS:** Progress payments shall be paid by the OWNER to the BUILDER during the progress of the job, as specified in the agreement. The BUILDER shall periodically invoice the OWNER for progress payments. Progress payments will be made by the OWNER to the BUILDER within Ten (10) days of the date of the BUILDER'S invoice for progress payment. During the Ten day period, the OWNER shall review the correctness of the BUILDER'S billing,

Owner: 

Exhibit 2

the progress of the work and conformance with the contract documents, and identify any concerns which the OWNER may have to the BUILDER. The OWNER shall note any observable work that does not appear to conform to the contract documents or which appears to be otherwise defective and shall bring it to the BUILDER'S attention in writing. There shall be no retainage and no hold back from any invoice for progress payment, except as the BUILDER and OWNER shall jointly agree may be withheld in a specific amount for a specific item of work.

8) **SCOPE OF WORK:** The contract documents identify the scope and detail of work to be performed by the BUILDER, and the BUILDER'S duty is to build according to the contract documents only. Contract documents are restricted to the construction agreement, the drawings, and the specifications. In case of conflicting information between contract documents, change orders shall take precedence over specifications and specifications shall take precedence over drawings. All work performed by the BUILDER which is not specifically detailed in this scope of work, shall be performed pursuant to the change order section of this agreement. Elevation drawings are provided for illustrative purposes only; actual construction may vary from elevations if required by physical restrictions.

9) **FINAL PAYMENT:** Payment of the entire unpaid balance of the contract price, together with increases or decreases in the contract price due to Change Orders and Allowances shall be paid by the OWNER within ten (10) days following the BUILDER'S submission of an invoice to the OWNER. Final Payment shall not be due until one or more of the following events has transpired; (1) OWNER commences to use or occupy the contractor's work, (2) BUILDER has completed the work listed in the final punch list and it has been signed off, or (3) OWNER fails or declines to furnish the BUILDER a written punch list as per the contract, within ten (10) days of the BUILDER'S request.  The OWNER may retain or hold back a certain amount of dollars or a certain percentage of the contract price (but not more than 5% of the total contract price plus change orders) in order to assure the contractor's corrections of the work, if any, completion of final miscellaneous work, and final cleaning of the premises. There shall be no retainage or hold back for warranty work. If requested by the BUILDER, the OWNER shall promptly deposit the hold back or retainage into a joint-signature interest bearing account under the names of both BUILDER and OWNER, to await disbursement based on completion of work listed in the final punch list. Prior to complete payment of the balance owed on the contract price, including all retainage and hold back as stated above, the
OWNER shall refrain from utilizing the premises upon which the BUILDER has performed work, unless mutually agreed upon in writing between the BUILDER and OWNER. If the OWNER uses or occupies any of the work performed by the BUILDER prior to making full payment to the contractor, then the owner agrees to unequivocally accept all of the BUILDER'S work "as is", without warranty.

10) **PREMISES:** BUILDER shall provide a reasonably safe working environment on the job site. At the completion of work, BUILDER shall remove all waste materials from the site, leaving the premises in a broom-clean condition. OWNER is responsible for informing BUILDER of all property lines, location of all underground restrictions or utilities, neighborhood covenants, and soil conditions which may affect the building process. OWNER is responsible for the removal of any hazardous waste which BUILDER may uncover during the course of construction. If asbestos or other hazardous waste is discovered, BUILDER shall promptly notify OWNER, and it shall be thereafter, the OWNER'S responsibility to contract a certified hazardous waste removal contractor. BUILDER shall not be responsible for unknown or unobservable structural, electrical, plumbing or mechanical conditions on the OWNER'S property.   Any resulting costs from unobservable conditions will be charged as an oral change order as described in Section 3. **Reasonable access; -** BUILDER will assume control of the job site portion of the property from the beginning of work to signing of  final inspection, or completion of the OWNER'S final punch list whichever comes first,  and has the right to working hours (7am – 5pm) access. BUILDER also has the right to install curbside job signs for purposes of identifying BUILDER'S presence on the job site. OWNER will not occupy job site during course of the job without BUILDER'S permission. OWNER will provide adequate utilities for the work. OWNER will remove all possessions from job site, and will assume responsibility for damages to items not removed from job site. BUILDER will in turn exercise reasonable care to protect property and possessions from harm.

11) **EMPLOYEES AND PERIODIC INSPECTIONS:**  BUILDER'S employees and subcontractors will report directly to BUILDER'S production manager. OWNER will restrict conversation with

Owner: _____

Exhibit 2

employees and subcontractors to a minimum, and will not distract them from their work, nor attempt to direct them in any way. OWNER is entitled to periodic inspections of the work site prior to work starting and after the evening clean up are the best times. OWNER'S entry onto the work site shall be at OWNER'S risk, holding the BUILDER harmless for any personal injuries or property damage. OWNER will not attempt to hire BUILDER'S employees, or to hire BUILDER'S subcontractors during the course of the job, without written approval of BUILDER. **Assignment;** BUILDER may elect to subcontract portions of the job at his discretion. Scope of the work to be subcontracted may be changed by BUILDER if desired. BUILDER'S employees and subcontractors will schedule their activities with the approval of the BUILDER. Costs incurred by BUILDER as a result of delays, caused by OWNER, will be charged to OWNER. **Communicating with BUILDER; -** An officer of the BUILDER will be readily accessible to OWNER at all times during the work day. OWNER and BUILDER may stipulate specific times for exchanging information and inspecting work in progress and may wish to leave a note pad on the job site for exchange of specific information concerning the job.

12) **CONTRACT PRICE:** Full contract price will include Washington State Sales Tax, and OWNER shall include payment of sales tax on all progress payments and final payment.  Contract price is good for thirty days from date of agreement and is subject to re-negotiation and change if construction does not begin within ninety days of the date of the construction agreement, due to delays which are not the fault or responsibility of the BUILDER.  Contract price has not been increased to include contingencies or contractor allowances for the unknown or unobserved conditions mentioned in the Premises section. **Interest;** Any accrued balance owing and unpaid to the BUILDER shall bear interest at the rate of 18 percent per annum. Interest shall be calculated on the balance owing and unpaid, regardless of whether or not that balance is liquidated or unliquidated.

13) **ALLOWANCES:** An allowance constitutes a dollar value of the contract price which has been set aside for the purpose of financing a distinct portion of the work, such as light fixtures, floor coverings, etc. OWNER is responsible for reviewing the allowance amounts prior to signing the agreement, in order to assure consistency with OWNER'S expectations regarding quality and expense of the allowed item. Should the OWNER specify that the allowance material be changed from the original scope, and this change causes the method of installation to vary (i.e. carpet exchanged for tile), -or- should the OWNER specify that a material be installed with a layout other than standard (tile installed on point or in a pattern/mosaic, hardwood installed with herringbone corners, etc.), this modification will be deemed outside the scope of work, and therefore a Change Order may need to be drafted. When an overage occurs on an allowed item, the OWNER shall pay the BUILDER an added amount to cover the overage; conversely, if the cost of an allowed item is less than the allowance, the residual shall constitute a credit to the OWNER, and will result in a decrease in the final amount owed to the BUILDER. If the sum of all allowances is exceeded by 20% or more, an additional 20% markup will be assessed to the overage.
Allowances will be identified in the *Scope of Work* portion of the contract documents by the word "Allowances", followed by a list of items, all assigned a dollar value.

14) **COST BREAKDOWNS:** BUILDER may provide a cost breakdown to either the OWNER or the OWNER'S lender for estimating purposes, or for the purpose of assisting the owner in obtaining financing from a commercial lender. Breakdown is not intended to be a bid, allowance, or guaranteed sum of money expended on individual items of construction and is not intended to modify the contract price stated in the contract, nor is cost breakdown intended to modify the scope of work.

15) **WORK PERFORMED BY OWNER:** OWNER may supply his own labor and materials for certain portions of work, as itemized in the specifications portion of the contract documents. OWNER is responsible for the timeliness and quality of all labor and material furnished by the OWNER and is responsible for the performance of such work according to the BUILDER'S schedule. OWNER is responsible to Change Order clause for extra costs incurred as a consequence of OWNER'S failure to perform in a timely manner, without defect. OWNER shall be responsible for replacement of any damaged (OWNER supplied) items provided to the site for contractor to install, regardless of type of damages and including damage that may occur during installation. OWNER is responsible for all warranty work on items he provides for contractor to install.

Owner: 

Exhibit 2

**16) SEVERABILITY:** If any part of this agreement is found to be invalid or unenforceable by the court, the remaining provisions shall remain in force between the parties. This contract can be modified only by a written document approved by both the OWNER and the BUILDER.

**The owner has read and agrees to the terms and conditions as stated above.**

OWNER'S SIGNATURE _____ Date 1/29/19

PRINT LEGAL NAME _____ Maxine McCallum _____

Owners' Mailing address _521 N Yakima Ave, Tacoma, WA 98375_

General Contractor_____ Title _____ Date_____
H. York Enterprises, LLC

Exhibit 2

**Date: 1/29/2019**

### NOTICE TO CUSTOMER (From the State of Washington RCW 18.27.114)

This BUILDER, **H. York Enterprises, LLC** is registered with the State of Washington, Registration #YORKEE*968PR as a general contractor and has posted with the State, a bond of $12,000.00 for the purpose of satisfying claims against the contractor for breach of contract including negligent or improper work in the conduct of the contractor's business. The expiration date of the contractor's current registration is 01/18/2020, and is renewed annually.

**THIS BOND MIGHT NOT BE SUFFICIENT TO COVER A CLAIM THAT MIGHT ARISE FROM THE WORK DONE UNDER YOUR CONTRACT.**

This bond is not for your exclusive use because it covers all work performed by this contractor.  The bond is intended to pay valid claims up to $12,000 that you and other customers, suppliers, subcontractors, or taxing authorities may have.

**FOR GREATER PROTECTION, YOU MAY WITHHOLD A PERCENTAGE OF YOUR CONTRACT.**

You may withhold a contractually defined percentage of your construction contract as retainage for a stated period of time to provide protection to you and help insure that your project will be complete as required by your contract.

**YOUR PROPERTY MAY BE LIENED.**

If any supplier of materials used in your construction project or any employee of the contractor or subcontractor is not paid by the contractor or subcontractor on your job, your property may be liened to force payment and you could pay twice for the same work.

**FOR ADDITIONAL PROTECTION, YOU MAY REQUEST THE CONTRACTOR TO PROVIDE YOU WITH ORIGINAL "LIEN RELEASE" DOCUMENTS FROM EACH SUPPLIER OR SUBCONTRACTOR ON YOUR PROJECT.**

The contractor is required to provide you with further information about lien release documents if you request it.  General information is also available from the Department of Labor and Industries.

**Other Insurances**

BUILDER also warrants that he is currently paying all appropriate taxes, including Workmen's Compensation, Employment Security, and Washington State Sales Tax, and that all employees on the site are covered by Workmen's Compensation. OWNER warrants that his homeowner's insurance policy (casualty, property damage and liability) is in force and covers the portion of the house under construction as well as the rest of the property.  OWNER shall notify his insurance agent as to this agreement and obtain any necessary additional coverage such as builder's risk.

**The owners(s) have read the notice to customer above.**

OWNER'S SIGNATURE _Maxine McCallum_ DATE 1/29/19

PRINT LEGAL NAME  Maxine McCallum

OWNER'S SIGNATURE _____ DATE _____

PRINT LEGAL NAME _____

MAILING ADDRESS  521 N Yakima Ave  Tacoma WA 98375

PHONE NUMBER  6097729598

This document will be kept on file for a minimum of three years and will be made available upon request, to the Department of Labor & Industries.

Owner: _____

Exhibit 2

| Customer Contact Information | | |
|---|---|---|
| Name (s): | | |
| Address: | | |
| City: | State: | ZIP Code: |
| Phone: | Cell: | Secondary Cell: |
| E-mail: | Fax: | |

| Employment Contact Information | | |
|---|---|---|
| Customer Name: | Employer: | |
| Employer address: | | |
| City: | State: | Zip Code: |
| Phone: | E-mail: | Fax: |
| Special Contact Information: | | |

| Secondary Employment Contact Information | | |
|---|---|---|
| Customer Name: | Employer: | |
| Employer address: | Employer address: | |
| City: | | |
| Phone: | Phone: | Phone: |
| Special Contact Information: | | |

| Emergency Contact | | |
|---|---|---|
| Name of a person not residing with you: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Relationship to you: | Phone: | Cell: |
| Additional Information: | | |

| Additional Contact Information: |
|---|
| |

Owner: _____

Exhibit 2